PHILLIP A. TALBERT
United States Attorney
KATHERINE T. LYDON
SHEA J. KENNY
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

**FILED**
Mar 21, 2024
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

HOSSAM HEMDAN,
JAVIER SALGUERO,
YEHIA HARB,
OSCAR GOMEZ,
GUILLERMO TOVAR,
ARWA HARB,
NAS MESHAL,
KHALED HAMDAN,
MINH TRUONG,
THONG TRUONG,
JEREMY EARLS, and
MICHAEL NGUYEN,

Defendants.

CASE NO. 2:24-cr-0071 DJC

18 U.S.C. § 371 – Conspiracy to Violate the Clean Air Act; 42 U.S.C. § 7413(c)(2)(A) – False Statements in Clean Air Act Documents (8 counts)

# INDICTMENT

COUNT ONE: [18 U.S.C. § 371 – Conspiracy to Violate the Clean Air Act]

The Grand Jury charges:

HOSSAM HEMDAN,
JAVIER SALGUERO,
YEHIA HARB,
OSCAR GOMEZ,
GUILLERMO TOVAR,

ARWA HARB,
NAS MESHAL,
KHALED HAMDAN,
MINH TRUONG,
THONG TRUONG,
JEREMY EARLS, and
MICHAEL NGUYEN,

defendants herein, as follows:

## I. INTRODUCTION

At all times relevant to the Indictment:

### A. Overview

1. Vehicles that combusted fuel emitted greenhouse gasses as well as emissions that formed smog. Smog-forming emissions resulted in added pollutants in the air. Smog-forming emissions included nitrogen oxides, non-methane organic gases, carbon monoxide, particulate matter, and formaldehyde. These pollutants harmed the health of Californians and the environment.

2. To achieve the objectives of the Clean Air Act to minimize smog and protect public health, vehicles registered in California were periodically required to undergo and pass smog emissions inspections.

3. Defendant HOSSAM HEMDAN and others known and unknown to the grand jury designed, manufactured, sold, and utilized a line of sophisticated smog inspection cheating devices known collectively as OBDNator devices. OBDNator devices could be plugged into California smog inspection equipment to impersonate the vehicles being tested. OBDNator devices enabled their users to pass vehicles that would otherwise fail California's smog inspections by mimicking the data and identifying information that would normally be reported by a vehicle in passing condition. Defendants herein and others known and unknown to the grand jury used OBDNator devices to collect clean data from vehicles that could legitimately pass smog inspections, compiled that data in collections, and then used OBDNator devices together with the clean vehicle data to fraudulently pass emissions-noncompliant vehicles.

4. The conspiracy charged herein began no later than October 30, 2015, and continued through in or about March 2024. From 2020 onward, substantially all of the sophisticated smog cheating devices the Bureau of Automotive Repair has encountered during inspections of smog check

stations have been OBDNator devices.

## B. Legal and Regulatory Background

### 1. The Clean Air Act

5. The Clean Air Act was enacted by Congress "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population[.]" 42 U.S.C. § 7401(b)(1).

6. The Clean Air Act provided for criminal punishment of any person who knowingly "makes any false material statement, representation, or certification in, or omits material information from, or knowingly alters, conceals, or fails to file or maintain any notice, application, record, report, plan, or other document required [pursuant to the Clean Air Act] to be either filed or maintained (whether with respect to the requirements imposed by the [EPA] Administrator or by a State)[.]" 42 U.S.C. § 7413(c)(2)(A).

### 2. California's Implementation of the Clean Air Act

7. The Clean Air Act required states with areas that exceeded national standards for certain pollutants, including California, to implement a vehicle inspection and maintenance program as part of their State Implementation Plan. 42 U.S.C. § 7511a(b)(4).

8. To implement the Clean Air Act, California established the Vehicle Emissions Inspection and Maintenance program, which has been incorporated into the federally enforceable State Implementation Plan. *See* 40 C.F.R. §§ 52.220, 52.241.

9. This program required that California residents bring certain vehicles to a licensed facility for emissions testing upon change of ownership and at periodic intervals based on the vehicle type and model year in order to obtain a registration or registration renewal. These emissions tests were commonly referred to as smog tests, smog inspections, or smog check inspections.

10. Smog check inspections were required to be conducted at licensed smog test facilities by licensed smog check technicians. Smog check technicians were required to conduct smog tests in accordance with the Smog Check Manual issued by the California Bureau of Automotive Repair ("BAR"). *See* Cal. Code Regs. Title 16 §§ 3340.42, 3340.45.

11. BAR licensed and regulated smog test facilities. Cal. Code. Regs., Title 16, § 3340.10.

### 3. Smog Inspections Involved Testing a Vehicle's On-Board Diagnostic System.

12. Modern vehicles (in this Indictment, considered to be vehicles with model years 2000 and later), contained an on-board computer. This on-board computer was referred to as an On-Board Diagnostics or "OBD" system. The procedures and statistics discussed herein relate to OBD tests and vehicles with model years 2000 and later.

13. Consistent with California law, a common method of smog check inspection was through a test of the vehicle's OBD. Cal. Code Regs. Title 16, § 3340.42. The test involved the smog technician connecting a test cable from a BAR-certified Data Acquisition Device to an OBD port inside the vehicle to retrieve information from the vehicle's OBD system. The purpose of the test was to determine if the vehicle's emissions control system was working properly and detect, among other things, diagnostic trouble codes ("trouble codes").

14. Trouble codes were digital codes that were stored in the vehicle's OBD system when the check engine light was activated in a vehicle. The trouble codes indicated what triggered the check engine light and may have included a list of components and/or emission system codes responsible for the fault.

15. BAR's systems analyzed the data from the vehicle's OBD to determine whether the vehicle passed the inspection. If the OBD reported certain problems, including that the check engine light was on or a diagnostic trouble code was activated, the vehicle would fail the overall inspection. California law established the conditions under which a vehicle would pass or fail inspection. Cal. Code Regs., Title 16, § 3340.42.2.

16. All vehicle data and test results associated with the smog check inspection—including the result of the inspection—were electronically transmitted to BAR's centralized database. Cal. Code Regs., Title 16, § 3340.17; 40 C.F.R. § 52.220(b)(372)(i)(A).

17. BAR's centralized servers, which received these electronic transmissions, were located in Rancho Cordova in the Eastern District of California.

### 4. Passing and Failing Smog Check Inspection

18. After each smog check, BAR would generate a Smog Check Vehicle Inspection Report (hereinafter, the "inspection report") reflecting certain inspection data and the final result.

19. If the vehicle passed the smog check inspection, the passing inspection report would contain a Smog Check Certificate Number. A copy of the inspection report would be provided to the vehicle owner and another copy of the inspection report was required under California law to be maintained by the smog testing facility for at least three years for inspection by BAR. Cal. Code Regs., Title 16, § 3340.15; 40 C.F.R. § 52.220(b)(372)(i)(A).

20. If the vehicle did not pass the smog check inspection, the Vehicle Inspection Report would reflect that the vehicle had not passed and the reasons the vehicle did not pass. Emissions-related repairs may have been necessary to address the reason(s) for the failure.

**5. OBD Simulators**

21. To circumvent the above-described regulations and procedures, OBD simulator devices were used illegally by some individuals in the smog check industry to cheat smog tests in order to pass vehicles that would not pass inspection if the vehicles' true OBD data were transmitted. Broadly speaking, OBD simulator devices mimicked the data and identifying information that would normally come from a vehicle's OBD if the vehicle were in passing condition. During a smog test, when the smog shop's Data Acquisition Device would ordinarily be plugged into the OBD port, the Data Acquisition Device would be plugged instead into an OBD simulator. The OBD simulator would respond favorably to BAR queries in the course of a smog test, no matter the condition or state of a vehicle's emission control system.

22. BAR's Engineering and Research Division in Sacramento worked to combat the illegal use of OBD simulators, by analyzing the data collected from vehicle inspections to detect whether the data received was consistent with the data normally expected from the specific vehicles. Thus, BAR endeavored to detect when the information flowing through the Data Acquisition Device was coming from an OBD simulator rather than directly from a real vehicle and could opt to not issue a passing smog check inspection report if simulator usage was detected. In addition, beginning in October 2022, OBD simulators were prohibited in the testing areas of all BAR-licensed smog stations. Cal. Code Regs. Title 16 § 3340.41(h) (effective Oct. 1, 2022).

**6. Impact of Smog Check Information Transmitted to BAR**

23. The information and data transmitted to BAR in the course of a smog check inspection,

and all information recorded on the inspection report, was material for several reasons. Among other things, BAR relied on that information and data to assess the state and performance of the emissions controls systems on the vehicle, determine whether to issue a passing smog certificate, assess whether the test was legitimate or fraudulent and, if the vehicle did not receive a passing smog inspection certificate, assess whether the vehicle should be directed to a station with a higher level of accreditation for any subsequent inspection.

24. In aggregate, the information transmitted to BAR in the course of smog check inspections and the information recorded on inspection reports was material to regulatory assessments of California's Vehicle Emissions Inspection and Maintenance Program and of particular smog shops and technicians. The resulting data regarding aggregate mobile emissions was utilized in policy decision-making with respect to addressing air pollution and climate change.

**C. <u>Individual Defendants and Entities</u>**

25. HOSSAM "SAM" HEMDAN, of Hawthorne, California, owned and controlled several smog stations, including ones in Hawthorne, California. At times during the conspiracy, HEMDAN also owned and controlled another automotive business in Los Angeles, California. HEMDAN designed, manufactured, sold, and utilized the OBDNator devices.

26. DECEDENT 1, formerly of Anaheim, California, owned and controlled smog stations, including one in Anaheim, California. DECEDENT 1 utilized the OBDNator devices, before passing away in August 2020.

27. JAVIER SALGUERO, of Inglewood, California, at times during the conspiracy, owned and controlled several smog shops, including one in Bell, California, and two in Maywood, California. SALGUERO utilized the OBDNator devices.

28. YEHIA HARB of Hawthorne, California, owned and controlled a smog shop which was formerly in Venice, California, and presently in Hawthorne, California. Y. HARB utilized the OBDNator devices.

29. OSCAR GOMEZ of Rancho Cucamonga, California ran a school for automotive technicians in Rancho Cucamonga. At times during the conspiracy, GOMEZ operated out of a nearby smog station in Rancho Cucamonga, which was owned on paper by an associate of GOMEZ's, and

utilized the OBDNator devices.

30. GUILLERMO TOVAR, of Fontana, California, worked at multiple smog stations during the course of the conspiracy, including one in Rialto, California. TOVAR utilized the OBDNator devices.

31. ARWA HARB, of Redondo Beach, California, owned and controlled smog stations, including one in Wilmington, California and one in South Gate, California, and utilized the OBNATOR devices.

32. NAS MESHAL of La Palma, California, utilized the OBDNator devices.

33. KHALED HAMDAN, of Hawthorne, California, worked at businesses owned by HOSSAM HEMDAN and utilized the OBDNator devices.

34. MINH TRUONG, of San Jose, California, operated out of smog stations owned by THONG TRUONG. MINH TRUONG utilized the OBDNator devices.

35. THONG TRUONG, of San Jose, California, owned and controlled smog stations, including one in Newark, California, and one in San Jose, California. THONG TRUONG utilized the OBDNator devices.

36. JEREMY EARLS, of Lakewood, California, owned and controlled smog stations, including two in Long Beach, California. EARLS utilized the OBDNator devices.

37. MICHAEL NGUYEN, of National City, California, operated out of a smog station in Spring Valley, California, and utilized the OBDNator devices.

## II. <u>THE CONSPIRACY</u>

38. Beginning on a date no later than October 30, 2015, and continuing through in or about March 2024, in the State and Eastern District of California and elsewhere, defendants HEMDAN, SALGUERO, Y. HARB, GOMEZ, TOVAR, A. HARB, HAMDAN, MESHAL, M. TRUONG, T. TRUONG, EARLS, and NGUYEN knowingly and intentionally conspired with each other and persons known and unknown to the grand jury to knowingly make and cause to be made false material statements, representations, and certifications in, and omit material information from, and knowingly alter, conceal and fail to file and maintain applications, records, reports and documents required under the Clean Air Act, by transmitting false information to the BAR and generating fraudulent and false

vehicle inspection reports, in violation of Title 42, United States Code, Section 7413(c)(2)(A).

## III. MANNER AND MEANS

The manner and means by which the conspiracy was sought to be accomplished included, among others, the following:

### A. OBDNator Devices

39. HEMDAN designed and produced a line of devices known as OBDNators (which were also referred to as "Nators," "N8trs," "Stand alones," or "On-Demand" devices, among other nicknames). OBDNators were sophisticated OBD simulator devices that HEMDAN programmed. The OBDNator devices enabled their users to pass vehicles that would otherwise fail California's smog checks.

40. The OBDNator devices and accompanying software designed by HEMDAN, known as "Makina" software, were able to mimic the specific vehicles being tested far more effectively than traditional OBD simulator devices.

41. Specifically, the OBDNator device in collection mode could collect vehicle "profiles" (meaning the outputs of the OBD for a particular vehicle make, model, and year under smog test conditions). The user could then save the profiles to a database.

42. As part of the conspiracy, certain defendants and others known and unknown to the grand jury collected, compiled, and shared profiles for the purpose of passing vehicles that could not legitimately pass a smog inspection.

43. Then, when an OBDNator was put into "test" conditions and hooked up to a vehicle which could not legitimately pass the smog test, the user could look up the make, model, and year of the vehicle, consult a collection of passing vehicle "profiles" for the same make, model, and year, and use the OBDNator to feed the Data Acquisition Device (and accordingly BAR) the answers which a passing vehicle with the same "profile" would generate in response to the smog check.

44. The OBDNator thus could trick BAR's smog check system by appearing to be the actual vehicle in question, but with passing smog results.

45. This could induce BAR to issue a passing smog certificate to the vehicle associated with the specific Vehicle Identification Number in question.

**B. HEMDAN developed and distributed the OBDNator devices.**

46. Beginning no later than 2013 and continuing until 2020, HEMDAN hired persons known to the grand jury to assist him in developing and producing the OBDNator devices, the software applications used to run the devices, and a vehicle profile database. HEMDAN periodically updated the software, hardware, and profile-sharing methods.

47. By no later than 2015, HEMDAN had begun selling an early version of the OBDNator device. In or about late 2015, DECEDENT 1 purchased the OBDNator through an email account associated with HEMDAN for $9,500 and began using it to fraudulently pass smog inspections.

**C. The defendants utilized the OBDNator devices.**

48. Over the next several years, HEMDAN and others known and unknown to the grand jury grew the OBDNator distribution network.

49. As regulators implemented innovations to BAR's systems designed to detect the fraud, HEMDAN and others known and unknown to the grand jury innovated to attempt to evade detection capability. HEMDAN and others known and unknown to the grand jury made updates to the programming, hardware, and methods of using the OBDNator devices to avoid detection.

50. By no later than February 2019, HEMDAN had developed the "stand alone" or "on demand" version of the OBDNator, which is capable of passing vehicles without the vehicle being physically present, based on only the Vehicle Identification Number and a clean vehicle profile. By February 2019, HEMDAN was selling the stand alone version of the OBDNator for approximately $18,000.

51. The OBDNator device enabled the defendants to make more money than if they had only performed legitimate smog checks. During the period of the conspiracy, an average legitimate smog inspection would cost a vehicle owner approximately $50–$60, before application of any coupons or discounts. Customers paid varying rates for fraudulent smog inspections using the OBDNator devices, from approximately $120–$300.

**D. The defendants communicated and worked together in furtherance of the conspiracy.**

52. The defendants and others known and unknown to the grand jury coordinated closely in

furtherance of the conspiracy, both in person and via phone, email, text messages, and messages on an encrypted messaging platform.

53. Beginning in or about February 2019, HEMDAN started at least three group chats on an encrypted messaging platform to coordinate the criminal usage of the OBDNator devices. In these group chats, certain defendants and others known to the grand jury communicated regarding usage of the devices, collection of vehicle data to further the falsifications, updates to these devices, and tactics to avoid detection by inspectors.

a) On or about February 10, 2019, HEMDAN created the first and highest-echelon group chat, which was called "Twisted in head" and consisted at certain points of 8 of the defendants charged herein—HEMDAN, SALGUERO, Y. HARB, GOMEZ, TOVAR, A. HARB, MESHAL, HAMDAN—as well as DECEDENT 1.

b) On or about February 24, 2019, HEMDAN created a group chat called "Sos" which included, at one point, approximately 58 participants, including all 12 of the defendants charged herein—HEMDAN, SALGUERO, Y. HARB, GOMEZ, TOVAR, A. HARB, N. MESHAL, HAMDAN, M. TRUONG, T. TRUONG, J. EARLS, and M. NGUYEN—as well as DECEDENT 1. The defendants and others known to the grand jury used the "Sos" chat to alert each other about BAR and other law enforcement activity. HEMDAN directed the "Sos" group that no one was permitted to chat on the group thread, that it was for emergencies only, that undercover vehicles issuing citations did not qualify as emergencies, and that they should set a special ringer for alerts from this group— "And when it does alert u here drop ur food and read it. U will thank me later."

c) On or about June 20, 2019, HEMDAN created a group chat called "Green apple" which included, at one point, approximately 35 participants, including 10 of the defendants charged herein—HEMDAN, SALGUERO, Y. HARB, TOVAR, A. HARB, HAMDAN, M. TRUONG, T. TRUONG, J. EARLS, and M. NGUYEN—as well as DECEDENT 1.

54. Certain defendants and others known to the grand jury utilized the "Twisted in head" and "Green apple" encrypted messaging chats to share profiles, troubleshoot, share BAR detection information and assist each other in fraudulently passing smog inspections, as described above.

55. In these chat groups, certain defendants and others known to the grand jury stated that close communication and working together was essential to achieving the objectives of the criminal conspiracy, including avoiding detection. For example, on or about November 16, 2019, participants in the "Twisted in head" group brainstormed systems to generate pooled resources by each of them contributing $1 per usage of the OBDNator device. SALGUERO reasoned to MESHAL, "[y]ou and I push 400 a month easy. Multiply that by 30 stations and it's self sustained." HEMDAN opined that it was a "great" idea and mused that they could have consultants and attorneys on their payroll. SALGUERO agreed, "It's a great idea. Attorney, and engineer on payroll. Organized crime is the only way." Similarly, on or about December 19, 2019, HEMDAN stressed the importance of "work[ing] together as a group" in a message to the "Green apple" chat. HEMDAN summed up: "100 eyes and ears and brain better then one person" [*sic*].

56. The defendants and others known to the grand jury shared clean vehicle "profiles" and vehicle data with other members of the conspiracy to assist each other in fraudulently passing smog inspections.

57. The defendants and others known to the grand jury provided troubleshooting and other assistance to each other in utilizing the OBDNator devices and Makina software, as well as responding to idiosyncrasies of particular vehicle makes and models. They also advised each other on navigating fraudulent smog tests, including with respect to new queries BAR added to the smog inspection process to detect fraud.

58. In furtherance of the conspiracy, certain of the defendants intentionally strove to create a smog cheating scheme undetectable to regulators.

59. Certain of the defendants and others known to the grand jury alerted one another to possible BAR enforcement action, including actual and predicted BAR inspections of smog stations, for the purpose of concealing their uses of the OBDNator devices.

60. In addition to the group chats discussed above, certain of the defendants also communicated in furtherance of the conspiracy using direct messages on an encrypted messaging platform, text messages, email, and eventually, cloud database(s).

61. Each of the defendants personally utilized the OBDNator devices to fraudulently pass

smog inspections.

62. Certain of the defendants also utilized the OBDNator devices to fraudulently pass smog inspections for each other and others known and unknown to the grand jury, sometimes in exchange for payment. For example, certain defendants who had early access to the "stand alone" version of the OBDNator would be sent the Vehicle Identification Numbers of vehicles certain other defendants needed passed, would use the "stand alone" OBDNator to pass the vehicles, and then send back the passing smog certificate.

63. An additional method by which certain of the defendants fraudulently passed smog inspections using OBDNator devices was by using Technician ID numbers belonging to other people. Utilizing Technician ID numbers of other people served the functions of obfuscating those defendants' roles in fraudulent smog inspections and avoided generating patterns which could have led to the detection of the scheme.

64. Certain of the defendants organized in-person classes on how to use the OBDNator devices and associated software. For example, on or about July 4, 2019, DECEDENT 1 messaged M. TRUONG, "Sam is offering classes everyday" [*sic*] and suggested M. TRUONG should attend. On or about July 9, M. TRUONG did attend a class.

65. The defendants would relocate classes if the intended location was perceived to be too dangerous. On or about July 2, 2019, certain of the defendants intended to hold a class at a shop controlled by MESHAL; however, HEMDAN messaged the "Twisted in head" group that the location was "extremely dangers" [*sic*] and changed the location of the class to HEMDAN's own smog shop in Hawthorne, California. On or about July 5, 2019, HEMDAN messaged the "Twisted in head" group, "Make sure every one come to the class monday mostly about the new n8tr and running the new software and operation other wise u will miss a lot" and "Its for every one the entire group [/] If u notvfeeling comfirtable to show ur face its on u" [*sic*].

**E. <u>Impact of the OBDNator conspiracy</u>**

66. Due to the sophistication of the OBDNator devices at eluding detection by BAR, OBDNator users were responsible for a substantial volume of the successful fraudulent smog inspections in the state of California. From 2020 through March 2024, virtually all sophisticated

simulator devices encountered by BAR during inspections of smog stations were the OBDNator line of devices.

67. Certain of the defendants internally acknowledged and celebrated their success at essentially cornering the market on sophisticated simulator devices. For example, on approximately December 7, 2019, TOVAR messaged the "Twisted in head" group a series of messages on the different types of information that could be pulled from different kinds of cars and speculated what information BAR might be looking for when attempting to detect defeat devices. TOVAR concluded, "Im just tryin to be helpful guys [/] We're a good team and everyone brings something to [the] table [/] I cant believe its like a group of 10 of us thats the main core kicking BARs ass" [*sic*].

68. As of March 2024, BAR regularly detected more than 200 attempted smog cheating instances per day in the State of California. In the approximately six months prior to March 2024, BAR detected the use of a smog cheating device in approximately 0.5% of total smog inspections performed. Consistent with the shared goal of the conspirators to create an undetectable smog cheating device, many usages of the OBDNator device were not detected by BAR. For example, the fraudulent smog inspections charged as counts two, four, five, six, seven, eight, and nine of this indictment were not detected by BAR and resulted in passing smog certificates.

69. The defendants' smog cheating conspiracy undermined enforcement of the Clean Air Act. A comparison between the smog check failure rates of vehicles inspected in 2023 by BAR at random roadside checkpoints (13.5%) and by smog stations (7%) illustrated how smog cheating including by using OBDNator devices led to grossly polluting vehicles being driven on California's roads.

70. In addition, the most polluting cars, the ones which cannot pass smog inspections and which are passed fraudulently rather than being repaired or replaced, had an outsize impact on air quality. According to 2018 research presented by the California Air Review Board, while overall emissions from light duty vehicles was reduced by 75-85% over the preceding two decades, the highest emitting vehicles' contribution to the overall emissions increased – for example, the top 1% of emitting light-duty vehicles were responsible for approximately 42% of the total hydrocarbon emissions from all light-duty vehicles.

71. BAR and the California Air Review Board estimated that in 2022, if all smog check stations in California had operated as effectively as high-performing stations, that would have had the equivalent impact of reducing approximately 56 additional tons per day of exhaust emissions of reactive organic gases and nitrogen oxides.

72. These pollutants harmed the health of Californians and the environment. Elevated nitrogen oxides, for example, could cause asthma in children and were strongly associated with heart and lung harm, affected pregnancy and birth outcomes, and were likely associated with increased risk of kidney and neurological harm, autoimmune disorders and cancer.

## IV. <u>OVERT ACTS</u>

73. In furtherance of the conspiracy and to accomplish its objects, the defendants committed or caused to be committed the following overt acts, among others:

74. On or about February 26, 2019, in response to a person known to the grand jury's question to the "Sos" group chat, "how do you set screen lock on [the encrypted messaging app the group used]?" T. TRUONG messaged the members of the "Sos" chat group instructions regarding password protecting their phones.

75. On or about March 27, 2019, HEMDAN and DECEDENT 1 transmitted and caused to be transmitted false information to BAR, in the Eastern District of California, in order to cheat a smog test and obtain a false and fraudulent vehicle inspection report for a 2014 Dodge Ram.

76. On or about March 28, 2019, GOMEZ arranged via encrypted messages to pay DECEDENT 1 to fraudulently pass smog inspections for ten vehicles using DECEDENT 1's OBDNator. GOMEZ and DECEDENT 1 agreed upon a price of $100 per vehicle for 10 vehicles.

77. On or about April 4, 2019, GOMEZ transmitted and caused to be transmitted false information to BAR, in the Eastern District of California, in order to cheat a smog test and obtain a false and fraudulent vehicle inspection report for a 2004 Toyota Tacoma.

78. On or about April 6, 2019, SALGUERO transmitted and caused to be transmitted false information to BAR, in the Eastern District of California, in order to cheat a smog test and generate a false and fraudulent vehicle inspection report for a 2003 Land Rover.

79. On or about July 1, 2019, GOMEZ messaged the "Twisted in head" chat group to inform

his co-conspirators on that chat that BAR enforcement officers were at GOMEZ's shop.

80. On or about July 6, 2019, Y. HARB provided the members of the "Twisted in head" chat advice on using the OBDNator device with Dodge Neons. Y. HARB wrote, "By the way guys [/] Watch out for the neons [. . . ] bunch of missing lines in mode 6 […] apparently its normal for neons" [*sic*].

81. On or about July 2, July 8, and July 9, 2019, HEMDAN, MESHAL, Y. HARB, A. HARB, GOMEZ, M. TRUONG, EARLS, and others organized and/or attended "classes" to teach OBDNator users how to use the device and related software to fraudulently pass smog checks.

82. On or about July 9, HEMDAN, Y. HARB, and GOMEZ sent a series of messages to the "Twisted in head" group advising certain of the defendants on possible methods for hiding contraband from law enforcement in order to avoid the conspiracy being detected. HEMDAN messaged the group that, "by law no one can open sealed mail maybe if we have some thing that u can seal quick and look like u received it they [law enforcement] cant touch period" [*sic*]. Y. HARB suggested, "Maybe keep one of those fedex box if some body walks in all u have to do is throw it in there and remove the adhesive cover and stick it closed done deal" [*sic*]. GOMEZ advised that this method of concealment may be insufficient: "Fedex would [be] private property [which] is slap on the hand now, plus if they have a warrant is doesn't matter who's package it is they will open it" [*sic*].

83. On or about July 13, 2019, TOVAR and DECEDENT 1 transmitted and caused to be transmitted false information to BAR, in the Eastern District of California, in order to cheat a smog test and generate a false and fraudulent vehicle inspection report for a 2011 Dodge Avenger.

84. On or about November 23, 2019, NGUYEN messaged DECEDENT 1 via an encrypted platform that NGUYEN was utilizing the OBDNator to collect clean profiles and requested assistance with utilizing the OBDNator. NGUYEN wrote, "Left out right in[?]" DECEDENT 1 answered, "Yes," to which NGUYEN responded "Thanks! [. . .] I'm collecting data." DECEDENT 1 responded, "Ok thanks."

85. On or about November 25, 2019, M. TRUONG and DECEDENT 1 transmitted and caused to be transmitted false information to BAR, in the Eastern District of California, in order to cheat a smog test and generate a false and fraudulent vehicle inspection report for a 2005 Honda Civic Hybrid.

86. On or about November 26, 2019, HAMDAN utilized the "Twisted in head" chat to

request and obtain a clean vehicle profile from SALGUERO. HAMDAN messaged the group, "In desperate need of a 2005 Audi S4 Quattro 4.2L. I'll pay for it just someone reply." SALGUERO responded, "I sent you 4 different S4's. Hope it helps you out." HAMDAN replied, "Thanks brother."

87. On or about November 28, 2019, T. TRUONG and DECEDENT 1 transmitted and caused to be transmitted false information to BAR, in the Eastern District of California, in order to cheat a smog test and generate a false and fraudulent vehicle inspection report for a 2003 Mazda 6S.

88. On or about December 4, 2019, A. HARB and DECEDENT 1 transmitted and caused to be transmitted false information to BAR, in the Eastern District of California, in order to cheat a smog test and generate a false and fraudulent vehicle inspection report for a 1995 Ford Crown Victoria.

89. On or about December 11, 2019, HEMDAN messaged the members of the "Green apple" chat group the username and password for the software used to operate the OBDNator defeat devices.

90. On or about December 13, 2019, HAMDAN, MESHAL and HEMDAN utilized the "Twisted in head" chat to troubleshoot regarding using the OBDNator for a specific vehicle. HAMDAN wrote, "Does any beautiful soul on this group have a 2017 Chevy 2500 HD diesel 6.6L Egr turbo[?]" HEMDAN asked, "Whats wrong with the one u doing[?]" HAMDAN answered, "They've been driving forever and 2 monitors not ready and engine light on [/] Cat and oxygen sensor not ready." MESHAL responded, "It [will] pass [/] With 2 inc." HAMDAN replied, "Even if values are 0s?" to which MESHAL responded, "Yes." Later, HEMDAN asked, "What are the monitors not ready and what codes it has." After HAMDAN reiterated that the "cat and oxygen sensor" were not ready, HEMDAN wrote, "Ok u need to fix those not what [MESHAL] said only."

91. On or about December 16, 2019, A. HARB sent a message to the "Green apple" chat alerting the members of the chat to enforcement activity at another smog station. A. HARB wrote, "Good morning Under cover c[o]ps and ice and the bar hit a shop in Wilmington Saturday 3pm[.] The whole plaza body shop Mechanic and smog[.] Asking for invoices and licenses for every one[.] And checked the bar licenses on the wall."

92. On or about December 20, 2019, T. TRUONG used the "Green apple" chat to share clean profiles. A member of the chat group asked "Anyone have a 2002 is300 auto[?]" T. TRUONG responded "Email?" After receiving the email address, T. TRUONG wrote, "Sent."

93. On or about December 20, 2019, T. TRUONG used the "Green apple" chat to request clean profiles, messaging the "Green apple" group, "Anyone have data for 2010 Ford F-250 6.4L diesel?" DECEDENT 1 responded that he had the data and asked for T. TRUONG's email address. T. TRUONG provided his email address.

94. On or about December 20, 2019, NGUYEN transmitted and caused to be transmitted false information to BAR, in the Eastern District of California, in order to cheat a smog test and generate a false and fraudulent vehicle inspection report for a 2011 Nissan Cube.

95. On or about December 22, 2019, NGUYEN attempted to obtain a replacement OBDNator from DECEDENT 1 or HEMDAN after NGUYEN's OBDNator broke, or "burned." NGUYEN wrote, "I used the new n8r for 5 cars yesterday and worked good. Its weird how I start using it with old cars it burns. But im just going to stop doing old cars. Can I have another n8r. Please can u talk to sam [HEMDAN]. Because these cables r new and it caused it. And I still pay whatever u want. I know this is annoying im sorry man. I know u dont have time but I can drive to sams shop to swap but ill still pay u" [*sic*].

96. On or about January 4, 2020, M. TRUONG messaged the "Green apple" chat group to request a clean profile for a "2012 GMC Sierra 2500HD 6.0L."

97. On or about January 12, 2020, MESHAL messaged the "Twisted in head" chat to request and obtain a clean vehicle profile. MESHAL wrote, "Hey guys anyone got a 01 Benz ml500." HEMDAN responded that he had just sent the profile to MESHAL's email address. MESHAL responded, "Hell yah thank you."

98. On or about January 16, 2020, HAMDAN sent a message to the "Twisted in head" chat alerting them of possible enforcement activity that day. HAMDAN wrote, in part, "Rumors going on from the Inland Empire area that there may be a BAR raid today in the Inland Empire Area. . . . Most likely all talk, stay extra cautious just in case."

99. On or about January 16, 2020, TOVAR sent a message to the "Sos" chat alerting the group as to ongoing enforcement activity. TOVAR wrote, "Theyre in riverside over here. No fbi or sherrifs, only bar" [*sic*].

100. On or about January 16, 2020, following the above-described warning from HAMDAN

of possible enforcement activity, SALGUERO messaged the "Twisted in head" group to remind them to "be on high alert and thank [HAMDAN] for the heads up." SALGUERO added, "I'm not in the inland empire but I'll watch over my Empire." Approximately one hour and forty-five minutes later, SALGUERO alerted the "Twisted in head" group that law enforcement was at his shop and gave details about the enforcement activity, including the contents of the search warrant: "Cops, fbi at my shop. [/] Watch yourselves [/] I'm not there. I'm gonna go find out what's up? [/] No BAR [/] I'm gonna dump my phone." Approximately 10 minutes later SALGUERO updated the "Twisted in head" group, "Sherrifs left, FBI is inside looking through stuff. They stormed the place. The warrant doesn't have My name or any tech's name on it. It says digital devices not including cell phones [/] It's serious! There's law enforcement going through everything. . . . [/] Warrant is for electronic devices not including phones. Techs are outside. No arrest warrant . . . Warrant specifies nator and [Makina] softwarr" [*sic*].

101. On or about January 16, 2020, SALGUERO was in possession of an OBDNator. Law enforcement encountered the OBDNator and associated cables when executing a search of SALGUERO's smog shop Smog Del Rio. Law enforcement found SALGUERO's fingerprints on the OBDNator.

102. On or about January 17, 2020, the day after federal search warrants were executed on shops associated with HEMDAN, HAMDAN, SALGUERO, Y. HARB, and DECEDENT 1, HEMDAN messaged a contractor he had been working with to create a vehicle profile sharing database and told the contractor to stop using the database and the email address the two had been communicating on. HEMDAN told the contractor the database had been "hacked" and that HEMDAN would send him a new link and new email address.

103. On or about October 28, 2020, EARLS was in possession of an OBDNator. BAR encountered the OBDNator and associated cables during an inspection of a smog shop owned and controlled by EARLS.

104. On or about March 2, 2022, EARLS made deceptive and incomplete statements during an interview with law enforcement in order to avoid detection of the conspiracy, including that he did not know who was involved in the assembly and proliferation of OBDNator devices.

All in violation of Title 18, United States Code, Section 371.

COUNT TWO: [42 U.S.C. § 7413(c)(2)(A) – False Statements in Clean Air Act Documents]

The Grand Jury further charges: T H A T

HOSSAM HEMDAN,

defendant herein, on or about March 27, 2019, in the County of Sacramento, State and Eastern District of California, did knowingly make and cause to be made a false material statement, representation, and certification in, and omit material information from, and knowingly alter, conceal, and fail to file and maintain an application, record, report and document required under the Clean Air Act, by attempting to cheat a smog test for a 2014 Dodge Ram by transmitting false information to BAR and generating a false and fraudulent vehicle inspection report, and did knowingly aid, abet, assist, counsel, induce, and procure the same, in violation of Title 18, United States Code, Section 2, and Title 42, United States Code, Section 7413(c)(2)(A).

COUNT THREE: [42 U.S.C. § 7413(c)(2)(A) – False Statements in Clean Air Act Documents]

The Grand Jury further charges: T H A T

JAVIER SALGUERO,

defendant herein, on or about April 6, 2019, in the County of Sacramento, State and Eastern District of California, did knowingly make and cause to be made a false material statement, representation, and certification in, and omit material information from, and knowingly alter, conceal, and fail to file and maintain an application, record, report and document required under the Clean Air Act, by attempting to cheat a smog test for a 2003 Land Rover by transmitting false information to BAR and generating a false and fraudulent vehicle inspection report, and did knowingly aid, abet, assist, counsel, induce, and procure the same, in violation of Title 18, United States Code, Section 2, and Title 42, United States Code, Section 7413(c)(2)(A).

COUNT FOUR: [42 U.S.C. § 7413(c)(2)(A) – False Statements in Clean Air Act Documents]

The Grand Jury further charges: T H A T

OSCAR GOMEZ,

defendant herein, on or about April 4, 2019, in the County of Sacramento, State and Eastern District of California, did knowingly make and cause to be made a false material statement, representation, and

certification in, and omit material information from, and knowingly alter and conceal an application, record, report and document required under the Clean Air Act, by cheating a smog test for a 2004 Toyota Tacoma by transmitting false information to BAR and generating a false and fraudulent vehicle inspection report, and did knowingly aid, abet, assist, counsel, induce, and procure the same, in violation of Title 18, United States Code, Section 2, and Title 42, United States Code, Section 7413(c)(2)(A).

COUNT FIVE: [42 U.S.C. § 7413(c)(2)(A) – False Statements in Clean Air Act Documents]

The Grand Jury further charges: T H A T

GUILLERMO TOVAR,

defendant herein, on or about July 13, 2019, in the County of Sacramento, State and Eastern District of California, did knowingly make and cause to be made a false material statement, representation, and certification in, and omit material information from, and knowingly alter, conceal, and fail to file and maintain an application, record, report and document required under the Clean Air Act, by attempting to cheat a smog test for a 2011 Dodge Avenger by transmitting false information to BAR and generating a false and fraudulent vehicle inspection report, and did knowingly aid, abet, assist, counsel, induce, and procure the same, in violation of Title 18, United States Code, Section 2, and Title 42, United States Code, Section 7413(c)(2)(A).

COUNT SIX: [42 U.S.C. § 7413(c)(2)(A) – False Statements in Clean Air Act Documents]

The Grand Jury further charges: T H A T

ARWA HARB,

defendant herein, on or about December 4, 2019, in the County of Sacramento, State and Eastern District of California, did knowingly make and cause to be made a false material statement, representation, and certification in, and omit material information from, and knowingly alter and conceal an application, record, report and document required under the Clean Air Act, by attempting to cheat a smog test for a 1995 Ford Crown Victoria by transmitting false information to BAR and generating a false and fraudulent vehicle inspection report, and did knowingly aid, abet, assist, counsel, induce, and procure the same, in violation of Title 18, United States Code, Section 2, and Title 42, United States Code, Section 7413(c)(2)(A).

///

COUNT SEVEN: [42 U.S.C. § 7413(c)(2)(A) – False Statements in Clean Air Act Documents]

The Grand Jury further charges: T H A T

MINH TRUONG,

defendant herein, on or about November 25, 2019, in the County of Sacramento, State and Eastern District of California, did knowingly make and cause to be made a false material statement, representation, and certification in, and omit material information from, and knowingly alter, conceal, and fail to file and maintain an application, record, report and document required under the Clean Air Act, by attempting to cheat a smog test for a 2005 Honda Civic Hybrid by transmitting false information to BAR and generating a false and fraudulent vehicle inspection report, and did knowingly aid, abet, assist, counsel, induce, and procure the same, in violation of Title 18, United States Code, Section 2, and Title 42, United States Code, Section 7413(c)(2)(A).

COUNT EIGHT: [42 U.S.C. § 7413(c)(2)(A) – False Statements in Clean Air Act Documents]

The Grand Jury further charges: T H A T

THONG TRUONG,

defendant herein, on or about November 28, 2019, in the County of Sacramento, State and Eastern District of California, did knowingly make and cause to be made a false material statement, representation, and certification in, and omit material information from, and knowingly alter, conceal, and fail to file and maintain an application, record, report and document required under the Clean Air Act, by attempting to cheat a smog test for a 2003 Mazda 6S by transmitting false information to BAR and generating a false and fraudulent vehicle inspection report, and did knowingly aid, abet, assist, counsel, induce, and procure the same, in violation of Title 18, United States Code, Section 2, and Title 42, United States Code, Section 7413(c)(2)(A).

COUNT NINE: [42 U.S.C. § 7413(c)(2)(A) – False Statements in Clean Air Act Documents]

The Grand Jury further charges: T H A T

MICHAEL NGUYEN,

defendant herein, on or about December 20, 2019, in the County of Sacramento, State and Eastern District of California, did knowingly make a false material statement, representation, and certification in, and omit material information from, and knowingly alter, conceal, and fail to file and maintain an

application, record, report and document required under the Clean Air Act, by attempting to cheat a smog test for a 2011 Nissan Cube by transmitting false information to BAR and generating a false and fraudulent vehicle inspection report, and did knowingly aid, abet, assist, counsel, induce, and procure the same, in violation of Title 18, United States Code, Section 2, and Title 42, United States Code, Section 7413(c)(2)(A).

A TRUE BILL.

**/s/ Signature on file w/AUSA**

FOREPERSON

PHILLIP A. TALBERT
United States Attorney

*No.* ___________

**UNITED STATES DISTRICT COURT**

*Eastern District of California*

*Criminal Division*

THE UNITED STATES OF AMERICA

*vs.*

HOSSAM HEMDAN,
JAVIER SALGUERO,
YEHIA HARB,
OSCAR GOMEZ,
GUILLERMO TOVAR,
ARWA HARB,
NAS MESHAL,
KHALED HAMDAN,
MINH TRUONG,
THONG TRUONG,
JEREMY EARLS, and
MICHAEL NGUYEN

I N D I C T M E N T

**VIOLATION(S):** 18 U.S.C. § 371 – Conspiracy to Violate the Clean Air Act; 42 U.S.C. § 7413(c)(2)(A) – False Statements in Clean Air Act Documents (8 counts)

*A true bill,* **/s/ Signature on file w/AUSA**

_____________________________________
*Foreman.*

*Filed in open court this* 21st

*of* March 2024 *, A.D. 20*

/s/ Shelly Her

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

*Bail, $* No bail bench warrants for all defendants.

_____________________________________

**United States v. Hemdan et al.**
**Penalties for Indictment**

**Defendants**
HOSSAM HEMDAN,
JAVIER SALGUERO,
YEHIA HARB,
OSCAR GOMEZ,
GUILLERMO TOVAR,
ARWA HARB,
NAS MESHAL,
KHALED HAMDAN,
MINH TRUONG,
THONG TRUONG,
JEREMY EARLS, and
MICHAEL NGUYEN

**COUNT 1:** **ALL DEFENDANTS**

VIOLATION: 18 U.S.C. § 371 – Conspiracy

PENALTIES: A maximum of up to 5 years in prison;
Fine of up to $250,000 or twice the gross gain or loss from the offense;
Supervised release of at least 3 years up to life.

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 2:** **HEMDAN**

VIOLATION: 42 U.S.C. § 7413(c)(2)(A) – False Statements in Clean Air Act documents

PENALTIES: A maximum of up to 2 years in prison;
Fine of up to $250,000 or twice the gross gain or loss from the offense;
Supervised release of at least 3 years up to life.

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 3:** **SALGUERO**

VIOLATION: 42 U.S.C. § 7413(c)(2)(A) – False Statements in Clean Air Act documents

PENALTIES: A maximum of up to 2 years in prison;
Fine of up to $250,000 or twice the gross gain or loss from the offense;
Supervised release of at least 3 years up to life.

SPECIAL ASSESSMENT: $100 (mandatory on each count)

| | |
|---|---|
| **COUNT 4:** | **GOMEZ** |
| VIOLATION: | 42 U.S.C. § 7413(c)(2)(A) – False Statements in Clean Air Act documents |
| PENALTIES: | A maximum of up to 2 years in prison;<br>Fine of up to $250,000 or twice the gross gain or loss from the offense;<br>Supervised release of at least 3 years up to life. |

SPECIAL ASSESSMENT: $100 (mandatory on each count)

| | |
|---|---|
| **COUNT 5:** | **TOVAR** |
| VIOLATION: | 42 U.S.C. § 7413(c)(2)(A) – False Statements in Clean Air Act documents |
| PENALTIES: | A maximum of up to 2 years in prison;<br>Fine of up to $250,000 or twice the gross gain or loss from the offense;<br>Supervised release of at least 3 years up to life. |

SPECIAL ASSESSMENT: $100 (mandatory on each count)

| | |
|---|---|
| **COUNT 6:** | **A. HARB** |
| VIOLATION: | 42 U.S.C. § 7413(c)(2)(A) – False Statements in Clean Air Act documents |
| PENALTIES: | A maximum of up to 2 years in prison;<br>Fine of up to $250,000 or twice the gross gain or loss from the offense;<br>Supervised release of at least 3 years up to life. |

SPECIAL ASSESSMENT: $100 (mandatory on each count)

| | |
|---|---|
| **COUNT 7:** | **M. TRUONG** |
| VIOLATION: | 42 U.S.C. § 7413(c)(2)(A) – False Statements in Clean Air Act documents |
| PENALTIES: | A maximum of up to 2 years in prison;<br>Fine of up to $250,000 or twice the gross gain or loss from the offense;<br>Supervised release of at least 3 years up to life. |

SPECIAL ASSESSMENT: $100 (mandatory on each count)

| | |
|---|---|
| **COUNT 8:** | **T. TRUONG** |
| VIOLATION: | 42 U.S.C. § 7413(c)(2)(A) – False Statements in Clean Air Act documents |
| PENALTIES: | A maximum of up to 2 years in prison;<br>Fine of up to $250,000 or twice the gross gain or loss from the offense; |

Supervised release of at least 3 years up to life.

SPECIAL ASSESSMENT: $100 (mandatory on each count)

| | |
|---|---|
| **<u>COUNT 9:</u>** | **NGUYEN** |
| VIOLATION: | 42 U.S.C. § 7413(c)(2)(A) – False Statements in Clean Air Act documents |
| PENALTIES: | A maximum of up to 2 years in prison;<br>Fine of up to $250,000 or twice the gross gain or loss from the offense;<br>Supervised release of at least 3 years up to life. |

SPECIAL ASSESSMENT: $100 (mandatory on each count)